and Tommy Blair, oral arguments be 10 minutes for each defendant and 20 minutes for plaintiffs. Ms. Mathieson for the appellant. Good morning, Your Honors. Good morning. Lisa Mathieson for appellant Christina Rogers. Your Honors, we propose to the court that the appellants reallocate between themselves 15 minutes for Ms. Rogers' argument with 3 of those minutes reserved for rebuttal, 5 minutes to be delivered by Mr. White on behalf of Mr. Blair, if that's acceptable to the court. Is that an objection? The problem I see here that I don't fully understand is this Bruton problem. I wish you would explain the background for me.  As the court knows, this prosecution arose out of the erstwhile cooperation attempts of an individual who eventually became a co-defendant of Ms. Rogers and went to trial with her. That is Mr. Blair, also an appellant before the court today. Mr. Blair became soured on the mortgage fraud that is at the heart of this case shortly after closing. In fact, in the light most favorable to the government. The seller of the property, Blair. Yes, he was. So he really felt scorned after Mr. Clark sort of basically defaulted after the first payment. It was long before that, actually, Your Honor, because, in fact, Mr. Clark demanded from Mr. Blair part of the proceeds of the fraud, essentially, as the government has characterized it, a kickback out of the fraud. Which Mr. Blair fully agreed to, to give him back $125,000. He kept the same of the bargain? He did, although he was quite disgruntled about it. And literally within days of the closing of the transaction, which was at least a month before the default, within days of the closing of the transaction, Mr. Blair was in his accountant's office saying to his accountant, I am in touch with the FBI and the IRS. There is something going on here. He very clearly at that point, Your Honor, did feel scorned. And converted from... But now, I understand, and I know we're not here talking about the facts, but it was not just that he at that point felt like something is going on. He was very aware of the inflation in the property value from $3.4 million to $4.2 million, correct? Certainly. It was not just some, all of a sudden he felt like, or learned that something was going on. He was really in the midst of what was going on pretty much from the start. He absolutely was, Your Honor. That was certainly the government's case, and in the light most favorable to the government, that is what the jury found. Mr. Blair, and it is a rather unusual factual scenario, decided that he was going to try to paint himself as a victim of this fraud that in the prosecution's theory he had been part and parcel of from the very beginning. And in the process of trying to paint himself as a victim and to cast blame on the individuals who became his co-defendants, my client, Ms. Rogers, and Mr. Samuel Clark, who ultimately cooperated, he did several things and made several statements that were highly incriminating of my client, including statements to the bank, the victim bank's closing attorney, made very shortly after the closing, and statements made to the victim bank's loan officer, made somewhat thereafter, eventually eliciting, in fact making a tape recording of Mr. Clark discussing the fraud. He actually made a recording, Your Honor, and on that recording made statements that were highly inculpatory of Ms. Rogers and of Mr. Clark, laid out the fraud and really the heart of the fraud and Ms. Rogers' participation in it. There were, Your Honor, there were statements, I believe two sets of statements to the closing attorney, statements to the loan officer and Mr. Forrester. There was the recorded call which was introduced for its truth at trial. The government does not contest that these statements were all used for their truth. And then Mr. Blair also had two interviews with the FBI at which he made statements incriminating of his co-defendants. All of those statements, Your Honor, were introduced at trial and each and every one of them was introduced for their truth. Okay, but if those points were in fact established by other evidence during the trial, other independent evidence, even if there is some burden issue, wouldn't that issue just be harmless? It would not, Your Honor, for two reasons. First, just as a matter of the facts, those points were not established by other evidence at trial. But more importantly, when this court sits in review of a constitutional violation, it is applying the Chapman v. California standard for constitutional harmless error. And that means that the burden is on the government to demonstrate beyond a reasonable doubt that there is no reasonable possibility that this evidence influenced the verdict. That means that this court is not to conduct a sufficiency analysis on the remaining evidence. This court has substated in several cases, including Carney, for one example cited in our brief. That means that the court is not to ask itself, would this jury have convicted were these statements not introduced? The court is to ask itself, do we have any basis in this record for concluding that the jury merely disregarded all of those statements when it reached its verdict and convicted on other evidence? The court cannot do so in this case for several reasons, most salient of which is that the government emphasized these recordings in particular over and over during its closing argument. And there's an important issue here because when the court... You're saying that in the closing argument, the prosecutor talked about this at length. Yes. And in fact, Your Honor, there is a very important point that the court will see when the court reviews the transcript of her closing argument. The prosecutor detailed certain evidence that in the government's view demonstrated Ms. Rogers' guilty knowledge and the falsity of the statements that she submitted to the bank. But when the prosecutor turned to the essential element of the intent to defraud, and as the court knows in a fraud case, knowledge is not enough. When the government turned to the essential element of intent to defraud, two times the prosecutor said to the jury, how do we know she intended to defraud the tapes? And the government relied on the tapes as the key evidence of Ms. Rogers' intent to defraud. But the cost the government in its closing argument opted to emphasize a piece of evidence, that doesn't mean that that evidence wasn't necessarily established someplace else. And I want to go back to the test that you articulated, because it sounds to me as if you have articulated an alternative theory that really constitutes a distinction without a difference when we're talking about how we determine whether or not there is a brutal violation that influenced the outcome. The way you apposited that, isn't that a distinction without a difference? Respectfully, no, Your Honor. It's a critically important distinction for several reasons. One, the Supreme Court has said numerous times that this is not a sufficiency analysis. It has affirmatively stated that it is error for a court of appeal to examine the balance of the evidence as though the challenged evidence had not come in, and to ask itself would the jury have convicted anyway. This court must be convinced, and it's the government's burden, that this jury disregarded this evidence. There is no reasonable possibility that this jury relied on this evidence when it reached its verdict. And that is simply impossible on this record, because as Judge Merritt had pointed out earlier, had elicited earlier, there were numerous instances of statements, several witnesses who testified to statements by Blair, not the tape alone. But the tape alone, of course, was the centerpiece of the case. And what we had was numerous references over the course of the trial by two representatives of the bank testifying separately, the case agent talking about verbal statements made to him by Mr. Blair, and then, of course, the tape, which was blockbuster evidence. The government's theory of admissibility was simply that it was in furtherance of the conspiracy. That was the basic justification. Yes, Your Honor. And that is… And what response did the district judge here, Greer, make when – did he raise issues about that in their discussion? He did not, Your Honor. As the court knows, there was explicit reference to the Bruton issue at trial, but there was no oral argument on the expressed topic of whether the statements were in furtherance of the conspiracy. One may infer, of course, that Judge Greer believed that the statements were not testimonial, but that was error. The reason that they were not in furtherance of the conspiracy, Your Honor, is twofold. First, when one looks at the indictment, which obviously is the definition of the scope of the conspiracy – this is in the record at pages two through four – one sees that the government charged the manner and means of the conspiracy as the events up to and including closing. The indictment has a section on page four of the record that says execution of the scheme. And the execution of the scheme, which was the object of the conspiracy, was the receipt of the funds at the closing table. So first, as charged, this conspiracy was complete at closing. Second, and more importantly, Your Honor, even if the conspiracy had continued, Mr. Blair's purpose at the time that he made the statements was not to further the conspiracy. It was to falsely exculpate himself and to inculpate the people who eventually became his co-defendants. And that means that – May I ask a question? I wonder if you would address whether or not the Bruton issue was preserved at trial. Thank you, Your Honor. Yes. The government suggested it was not, so please address their arguments to the contrary. Certainly. This court has stated in its Morgan decision and others that it will employ a common sense application of the plain error doctrine. And if the district court had an opportunity to address the issue and was aware of the issue at trial, then it will not apply plain error but will hold the issue to have been preserved. In fact, there was a – Counsel, is the answer that there was an appropriate objection or is the answer that there was not but it doesn't matter? The answer is twofold, Your Honor. First, the defendants, including Ms. Rogers, did raise the Bruton issue prior to trial. They did not – she did not renew it by objection at trial, although Mr. Blair's counsel did address Bruton at trial. Significantly, however, and this is under the court's Davis decision as well as Baker. In Baker, the court said that even when there was no objection by one defendant, an objection by a co-defendant was sufficient because the court clearly had been aware of the issue and had addressed it. So your position is that it was preserved? It was. But even if this court is going to apply the plain error doctrine, when this court reviews, for example, its Cromer decision, the court will find that in Cromer, the court found plain error affecting substantial rights because the challenge testimony went to the heart of the prosecution's case. I see my time is up. Thank you. The court has nothing further. Judge Cook, did you have another question? Oh, I thank counsel for that answer. Thank you. Thank you. Thank you. You'll have your rebuttal time. Counsel, Mr. Blair? Good morning, your honors. May it please this honorable court, William Wyatt on behalf of appellate Tommy Blair. I have five minutes that I would like to discuss the sophisticated means enhancement. As you know, that enhancement is typically preserved for fraud cases that are especially intricate or especially complex. I would argue that based on the charges of bank fraud, aiding and abetting bank fraud, and making a false statement to a bank, there's nothing about this fraud scheme or Mr. Blair's participation in this scheme that is particularly or especially complex or especially intricate, especially if you look at count four of the indictment. He's actually charged with making a false statement to a bank. Well, that's the exact conduct that he's being enhanced for, which is making four false documents or there being four false documents that are submitted to the bank in support of this loan. And so my argument is that with those four documents that are being used for the sophisticated means enhancement, that's not appropriate when in fact he's convicted under count four for the exact same conduct. And if you look at the four documents, when you look at his participation in those documents, it's minimal at best. Typically, a sophisticated means enhancement applies to a planning or a concealment type conduct. There's no planning by Mr. Blair that went into these four documents that are used for the sophisticated means enhancement. He wasn't involved in the planning to achieve the objective of creating enhanced value in order to get basically 100% of what he wanted to get from the bank in order to... Well, if you look at the timeline of events, it's an ever-changing target. What Ms. Rogers tells Mr. Clark that he needs to do is constantly changing. Initially, she starts with 100% financing, and then it goes down to 90% financing. And so if you look at how the sales contract is created, I think the testimony is that Mr. Blair is actually in his broker's office. And Ms. Rogers tells Sam Clark what the contract has to say. That information is relayed to Mr. Blair's hired broker, Dan Mitchell, who creates the document, and Mr. Blair simply signs it. I don't believe that that shows any planning on the part of Mr. Blair, and I certainly don't believe it's particularly sophisticated. In every bank fraud case, you're going to have some sort of documents that are fraudulent. What was the effect on the incentives of the enhancement? Well, it enhanced at two levels, which would be approximately 12 months. The second document that I would point out to the court are the phony down payment checks. I think the testimony is clear from trial. Mr. Blair had no knowledge of those at all until after the closing. He was never told about them, never knew about them until after the closing. There's the owner financing document. I think the testimony was Ms. Rogers brings that to Mr. Blair there at the closing right before Mr. Blair enters the attorney's office to do the closing. That document was never presented to the bank. It was not part of the closing package. I believe the testimony of Mr. Clark and Ms. Rogers was that that document was never even discussed at closing. That certainly was not used as a fraud on the bank. I understand that you say this is basically run-of-the-mill bank fraud, nothing particularly sophisticated about it. Do you have a particular case that you believe is strong authority for the position that you're advocating that this kind of series of transactions doesn't particularly amount to sophistication for purposes of the enhancement? I haven't found a single case, Your Honor, where sophisticated means was found to be an error, in all honesty. The closest that I could come was the Craig case that's in my brief where an attorney signed some documents. There was some false trust documents. What the appellate court with the Sixth Circuit said was this is a close call, but we're not going to overturn what the district court said because the attorney knew of the existence of these offshore accounts and fraudulent trusts. Since bank fraud is not all that rare, and you say that you haven't found a case to really support your position, what is the compelling piece of evidence in this case that says this is that unique and extraordinary case that this court ought to say, what happened here is not sufficiently sophisticated to apply the enhancement? I see my time's finished. Could you please answer that question? Yes, Your Honor. I believe that the fact that I can't find a case is one of the reasons that this case is so important, that you should look at not every fraud case should have a sophisticated means enhancement. In this case, I believe that the court should set out some sort of principle for determining when sophisticated means applies, and I believe that that principle should be this, that there has to be some sort of planning by the individual defendant that it's applied to to overcome some basic due diligence. In this case, the bank doesn't have any real obligation to find out that these documents were fraudulent, but if they had exercised any level of due diligence, they would have known that the Schedule C was not a real tax return. They would have looked at the fraudulent checks that were submitted that Mr. Blair had nothing to do with and seen that the check numbers were the exact same on all three checks, and so I believe that there has to be some finding that the scheme or artifice to the fraud is designed or planned sufficiently to overcome some basic level of due diligence. Why do you think the bank was so negligent? You know, I don't know. I mean, I know that Mr. Blair's position is that the bank knew about this. They wanted the loan to go through. I think that was actually the position of Sam Clark as well. If you read his testimony, at the time that they entered into the sales contract of $4.2 million, Mr. Clark himself was under the impression that the bank was turning a blind eye. I can't say if that's for sure, but that's the impression that Mr. Clark had, that they wanted this loan to go through, and so when that sales contract was signed for $4.2 million, even Mr. Clark's testimony was he didn't know if the bank knew about it or didn't know about it. Judge Cook, anything from you? No, thank you. Thank you. Thank you. Thank you, Your Honor. We'll now hear from the government. I guess I can adjust this. That was something of a disadvantage here. Good morning, Your Honor. I'm Helen Smith. Is this an adjustable podium? It's okay. It's okay. Very good. Thank you. I'm Helen Smith, and I represent the United States in this matter. I prepared an argument, but my experience has been that I get about two minutes into it, so if you have any questions about it, it's obvious that you're both very familiar with the facts. Are there any questions that you have? I'm concerned about the brutality because it would seem to me that a good prosecutor would know that the prosecutor is coming either across or very close to the line constitutionally of putting such extrajudicial statements in the record, and the reason I take it the prosecutor did that was that the prosecutor thought he needed this evidence in there, and so that sort of means that the prosecutor, at least, didn't think it was harmless error. That's a good question, Judge Muir. If I can go back a little bit and explain how Judge Greer conducts his trials and his deals with brutal issues, co-conspirator statements. I'm a big fan of Judge Greer just right off the bat. He was an experienced trial lawyer before he became a trial judge, and I had the honor of trying some cases against him, and I have the highest regard. He forces the United States to disclose prior to trial all statements which may qualify as brutal. I don't make that determination, but I comply. How does he do that? It's in his discovery and scheduling order, and in this instance— Brutalness specifically means— Yes, sir. And in this particular instance, because we had a delay in the trial, the trial was originally set, I think, for April or May, and it got continued until August because we had some conflicts with Mr. White's law firm, is my memory. Anyhow, it was put off, but I didn't know that until a day or two before trial. So I made all of my disclosures back in March or April of 2011. The case was actually tried in August several months later, and there were no changes. It's a very lengthy document, and I'll be happy to give you the site, but specific co-conspirator statements that I intended to rely upon, which included all of the statements. Now, in reality, the only—despite Ms. Matheson's characterization, the only statements that went in were the ones from the tape, which were actually transcribed and given to the jury. I want to make sure that the court understands that. They were collected back up, and they didn't have it for the jury room, but the statements were transcribed, and the reason we did that was so that the judge and all the parties would have the information in writing. That tape was very short. There are two instances that refer to Tina. That's Ms. Rogers, and only one sentence in there, which by any stretch of the imagination, inculpates Ms. Rogers. Judge, I filed that disclosure. We actually had a short mini—this is another thing that Judge Greer does before the trial starts, and oftentimes when you go from one day to the next, let's say on Monday, we started the trial of the case, on Tuesday of the next day, he'll call us all in there at 830, is my memory, and say, are there any issues that I need to discuss? Through the Bruton things and orally, Your Honor, I practically asked my opponents to raise, to flesh out any objections that they might have to Bruton, and it was never raised. Practically? What is practically? Well, you know, you can only go so far. I can't be their advocate, but if you look at the record, you will say to the judge, are there any other issues? And I say, and in fact, Ms. Matheson cites it in her appellate brief, Judge, there is potentially a Bruton issue. You told him that? Yes. At the conference? Correct, and it was silenced on the other side. Now, Mr. Adams, who was co-counsel with Mr. White for Mr. Blair, brought up a Bruton issue that had to do with Cameron Forrester, who was the bank loan officer, senior vice president and former law enforcement officer himself. Judge, he raised an issue, and we resolved that by, I made it very clear that I wasn't going to ask that question, and I didn't do that. I don't know that I consider myself a great prosecutor. I do consider myself a good prosecutor. And more than anything, in a case like this, which is clearly a target-rich environment, all of these documents, all of these acts, all of these false statements, I would never have consciously or even unconsciously tried to put in evidence which was not crucial to my case. The tape went in, and the theory always has been that these statements, that Tommy Blair made this tape, brought it into the FBI in December of 2006 of his own accord. He admitted to the two agents, including the supervisory agent when he did it, that he knew it was criminal behavior, and he knew it at the time that he committed it. So he brought it in. I have a whole different take on it than Ms. Mathewson does. He made that tape to inculpate Sam Clark. You're basically saying that the issue on behalf of Rogers was waived. Yes, Your Honor. It was never raised, and the standard of review should be clear error. It came in. There was never an objection to it. Correct, Your Honor. I think that Ms. Mathewson characterizes it as me conceding that there was a Bruton violation. Well, I would be fired if I did that because that's not what happened, but the reality is that I want a good record. Judge Greer wants a good record. We don't want to be reversed by the Sixth Circuit. We want to do it right the first time, and with the plethora of evidence of guilt that we had in this matter, why would I have done that? I would not have done it consciously. She also states, or Ms. Rogers argues that I emphasize it. If there had been an objection, you would not have put in the Bruton evidence. Well, then we would have had a ruling by Judge Greer, who was very comfortable with the rules of evidence, very accomplished. Don't we love Judge Greer? I do. I do. I'm a big fan. It doesn't make any difference about that. No, but he would have had the opportunity to make a ruling so that you would not be forced to make a de novo, or even an abuse of discretion. Your position really is had there been an objection. Yes, ma'am. You would have made your case before the judge as to why the tape should come in, and you would have abided by whatever the ruling was. Yes. And I did abide by, you know, when you do try to comply with Bruton to avoid any co-conspirator problems, you basically have to prepare two sets of questionings for your witnesses, the redacted and the unredacted. And that's what I had to do here. So I would have been happy to do that had there been a ruling. Okay, so, you know, I don't want to pre-terminate questioning on this point, but Ms. Matheson says that there was no other evidence on this particular issue. My recollection of the record was that there were other things in there to establish this. I want you to speak to, had the tape been excluded, what's the evidence in the record that would have still established this point, making the Bruton problem harmless? I certainly will. Forrester and Blankenship, that was Mr. Chris Blankenship, who was the loan broker that Tina Rogers associated to sort of shop the loan to the bank. They both testified that all of the false documents in this matter came from Tina Rogers and went to the bank. Sam Clark. When it came from, does that mean that somebody else created them, gave them to her, she passed them on? Are you saying that she was involved somehow in the creation of those documents or that they said that? Well, it depends on who you believe. According to Sam Clark. My question is, did somebody say she created these? Okay. Sam Clark. And if I had to put it in decreasing order of importance instead of chronologically, as I did the witnesses, you've got Sam Clark, who puts her in the scheme from day one. She told him, day one, I can do 100% financing for you, just like Sam's thinking she did for the jumbo loan for his house. Very same thing. He puts her at every stage. He says that she told him to create a paper trail, which meant three, not one, not two, but three fake bank checks for $465,000. And earn this money, which she knew, because she had helped him finance his house just the year before, that Sam Clark had had $42,000 by her own admission. On her own testimony, Mrs. Rogers, at trial, stated that the most money that Sam Clark had any availability, that's all the equity in his house and his kids' college education funds, the whole nine yards, was $42,000. She knew there was no way Sam Clark could have come up with $465,000 in earnest money. You've got Rogers, according to Sam, Rogers told Clark to tell Blair about the $210,000 promissory note, the side deal there. You know, she created that fake promissory note by her own admission. She created the amortization schedule for it. She fabricated the entire story to Mr. Clark and repeated it to Mr. Counts, or a variation thereof, about the kickback, the $125,000. You know, she was the lead in all of that. You've got two special agents, Agent Rushing and Agent Down, who both testified extensively about Rogers' role in the offense and the inescapable conclusion that she was involved. Her own testimony was highly incriminating. She was not, I know she recanted so many times her prior statements that she had made, but when she was arrested, she finally fessed up that the calculation sheet that she first attributed to Sam Clark, that she disavowed any knowledge of, that those were her figures, and she identified her handwriting and she admitted to Agent Down that she had to have known about the scheme in order to prepare the calculation. Highly incriminating was her own admission as well. You know, she was a completely unbelievable witness. You have the closing attorney, Larry Counts, who is unrebutted and undisputed, that out of all the closings he has seen, he had never seen anything like this, and this was mortgage fraud, hands down, from the get-go. I'd like to address two final things, and this goes back to Judge Merritt and trying to be a good prosecutor. Judge Greer kind of drives you kind of hard, and we ended up doing our closing arguments on the last day of testimony, which was Thursday. I really wasn't as prepared as I should have been, and that's probably why I cited the statement from Mr. Blair's tape, but I went back and I looked at my argument, and I went over time, which is another indication that I was not prepared. I stated 217 sentences, five sentences in that 217 sentences as regards the portion of the closing argument which pertained to Mrs. Rogers. So five out of 217 talked about the so-called Bruton statement. That is 2%. Counsel, could you confirm what I think I heard you say, which is that the tape and within the tape one sentence is the only Bruton concerned issue in this case? That's absolutely correct, Your Honor, and I thank you for pointing that out. I've actually got the transcript of it here, and it's very de minimis. I mean, the whole thing is about Tommy Blair inculpating Sam Clark. He was mad at Sam Clark because Sam Clark didn't pay his capital gains tax, and that came through numerous times as well. I think you also need to understand a little bit about the infurgence of the conspiracy and how things played out and why Mr. Clark, the different personalities, if any of these three defendants had bothered to be completely truthful with each other, they wouldn't have gotten into this trouble. But the initial fraud started with Mr. Blair when he falsely told Mr. Clark that I make a lot more money than I report on my tax return. And Mr. Blair knew at the closing. He actually knew a month before the closing. He knew that this deal would fail because he knew he had never generated the income that would be needed to service the debt. It was doomed from day one. And that explains why Mr. Blair immediately goes to the closing attorney and asks him to reissue another 1099 for, you know, $1.2 million less or something close to that. You have to look at the whole scheme of things. And I have run out of time. I think the sophisticated means enhancement, the fact that all three of us spent pages and pages in our appellate briefs trying to explain this scheme should demonstrate why the enhancement was applied. And Judge Greer, who I am a big fan of, correctly got that issue. Are there any further questions, Your Honor, either way? Or you, Judge Cook, just want to know how do you feel about Judge Greer? A waiver is your problem, one of them, on this issue. Because no, you inherited this case for appeal, as I understand. The trial counsel apparently never raised anything about this for the judge to understand that there was, on behalf of Rogers, an objection to it. And that normally is a waiver. Your Honor, there is no waiver of the constitutional right. The court may eventually choose to apply the plain error standard. But waiver is effectively not the precise application, not the precise terminology for what we're dealing with here. We contend that the issue was preserved because it was raised pretrial. And Judge Greer, of whom I have become a fan as well, was obviously very, very careful of it, about it. He made a mistake, Your Honors. He made a mistake. But he was absolutely cognizant of the brooding issue. And as this court has said, as a practical matter, the touchstone of plain error is whether the district court had an opportunity to address. But did the parties actually present the issue in a manner where you ask the judge to make a ruling? You know, if you're having a colloquy, everything that comes with a colloquy doesn't mean that the court has to rule on it. I mean, there's a way to make a motion or a request that puts the onus on the judge then to rule. And looking at the transcript, that's not exactly what happened here. Your Honor, it was not as precise as I wish that it were as appellate counsel. No question about that. But one significant thing about what Judge Greer did here is he, in fact, allowed the prosecutor to ask closed questions on direct exam with the goal of avoiding a brooding problem. Simply acknowledging the applicability of Bruton means that all parties were cognizant of the fact that these statements were testimonial. I do not suggest that Ms. Smith has waived the argument that Bruton was violated. But the government, by allowing that Bruton applied below, was acknowledging the testimonial nature of the statement. I'd like to take a moment just to give – I'm sorry. I have a problem with the case law that says, as I remember, that efforts to conceal the conspiracy after the fact are statements made in furtherance of the conspiracy. So the problem I've got here is that the judge, understanding that this was an issue – I mean, I think any federal judge who's got some experience knows that there are these Bruton problems. But if nobody objects to them at the time they're going to come in, then he may very well – the counsel has decided that this is not a good issue and is not raising an objection about it. That's the problem. If I may, Your Honor, my time is up. May I respond? Sure. Two things. First, the consequence of that would be plain error, not automatic affirmance. Second, the court said in U.S. v. Howard, which is 770 F. 2nd 57, that an attempt to conceal a conspiracy does not extend the conspiracy unless concealment was originally charged as an object of the conspiracy, which it was not. Anything – The law's kind of all over the place about that, isn't it? It's not, Your Honor, to this extent. First, one looks, of course, at the indictment to determine what the defendants were actually accused of doing. Second, and this is an alternative analysis, even if the court believes that the scope of the conspiracy is broad enough to encompass these statements, one must ask whether Blair was acting in concert with his co-defendants when he made these statements. And clearly he was not. To go back to Your Honor's word, he felt scorned at that point. And days after closing, he was telling his accountants that he was going to the FBI. They were not acting in concert at that point, Your Honor. They were at odds. And that demonstrates that the statements were not in furtherance of the conspiracy. If I may take one moment just to give the court sight to the references to the other statements that are at issue in Bruton. The testimony by the closing attorney is in the appendix at 1587, talking about what Blair told him, including statements about Ms. Rogers. The testimony by the loan officer is at 1373 and 74. The testimony by the case agent, which encompasses both the recording and verbal statements made to the case agent by Mr. Blair, are at pages 1901 through 19. The single statement in the recording to which Ms. Smith refers,  one at, it is appendix page 27. There's a reference to she, which in context is clearly a reference to my client. Also at appendix page 30. The court will see what Ms. Smith calls a single statement. It is a single statement, but the single statement is this. After recounting the detail of the scheme, Mr. Blair says, because Tina told me whatever she said agreed to it, so I did. So a single statement, Your Honors, but a single statement saying the whole thing was her idea. It's highly prejudicial even under a plain error standard. Ms. Smith said to the court that she would not have introduced evidence unless it was crucial to her case, and that's what the record reflects. Thank you. Thank you. Thank you for your arguments. The matter is submitted. Thank you.